UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Daveena D. Lawson | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17 CV 50034 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Daveena Lawson, who is 51 years old, seeks disability benefits based on physical and mental impairments. These include cervical spine arthralgias, right shoulder impingement, asthma, chronic obstructive pulmonary disease, bipolar disorder, general anxiety disorder, and personality disorder. The two main impairments are the spinal problems and the bipolar disorder, although her theory remains that the overall combination of impairments makes her an "unreliable worker." R. 39. The administrative law judge ("ALJ") held that plaintiff could do a reduced range of light work. The ALJ found that plaintiff lacked credibility because, among other things, she received only routine treatment and failed to consistently take her medications.

### **BACKGROUND**

The following is a partial summary of plaintiff's medical treatment, which relies heavily on the summary in plaintiff's opening brief. Although the record is lengthy (2576 pages), the parties focus mostly on only a few documents and findings.[2]

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] Plaintiff previously filed a disability application in 2006 and in 2011, both of which were denied and were not appealed. R. 37.

1

Plaintiff had two spinal fusion surgeries—one in April 2011 and another in March 2012. She claims that she now can't turn her neck because of pain that was apparently not corrected by these surgeries. R. 37.

From March 2012 to February 2013, plaintiff made a number of emergency room trips. Plaintiff presented with different problems, including numbness and tingling, chest pains, severe aching back pain, joint and lower leg pain, right shoulder pain radiating in her right arm, numbness in her neck, and migraines. *Id.* Plaintiff's brief summarizes these visits. By this Court's count, there were ten of them over a one-year period. It is unclear whether any were related to the bipolar disorder.

During this period, plaintiff was seen a number of times by her primary physician, Dr. John Schoenwald. Plaintiff also was treated at Rosecrance for her mental health problems. She was diagnosed with bipolar disorder and anxiety disorder. She saw a counselor there from November 2012 through August 2013. She received further unspecified treatment from December 2013 through December 2014, when she was also diagnosed with personality disorder. She was prescribed lamictal, lithium, risperdal, and trazodone.

Plaintiff was evaluated by two consultative examiners. On February 6, 2013, Dr. John Peggau diagnosed plaintiff with bipolar disorder and personality disorder and rated her GAF as 76. In his report, he noted that plaintiff was "flippant," "simple-minded," "not particularly friendly or engaging," and that she "gave up easily" on cognitive tests and "denied knowing any news events but actually did."[3] R. 1674. On September 25, 2013, Dr. NieKamp diagnosed plaintiff with "moderate to severe levels of depression and anxiety with PTSD features," and rated her GAF as 45. R. 2299.

---

[3] These comments suggest that Dr. Peggau may have believed that plaintiff was malingering, but he never explicitly made such a finding.

On March 24, 2014, plaintiff was examined by a vocational evaluator, Rae Ann McMurray, who found, among other things, that plaintiff's motor skills were sub-par. R. 339.

At the administrative hearing, on August 6, 2015, plaintiff testified about that she was told by her doctor that she would have to live with her neck pain for the rest of the rest of her life. R. 50. She stated that she could walk a block at a time and could sit or stand for 15 to 30 minutes and that she had trouble reaching over her head and difficulty moving her head up and down or side to side. R. 54, 56. On a typical day she sits and watches television.

Dr. Ellen Rozenfeld testified as an impartial expert. She opined that plaintiff had mild activities in daily living, moderate limitations in social functioning, and moderate limitations in concentration, persistence, or pace. R. 87. In her testimony, Dr. Rozenfeld noted, among other things, that plaintiff's bipolar disorder was initially rated as mild by Rosecrance, but was "bumped up to moderate" in July 2015, indicating "some worsening of symptoms"; that there were "gaps in treatment"; that plaintiff sometimes did not take her psychiatric medications; and that some of the periods of "increased symptomology" were related to external stressors. R. 84. Dr. Rozenfeld opined that plaintiff's concentration problems could be accounted for by limiting plaintiff to a routine and predictable work setting with only incidental public contact and only occasional contact with co-workers. R. 88. On cross-examination, Dr. Rozenfeld was asked about plaintiff's GAF scores, and responded that plaintiff's scores were "all over the map" and then noted that "we don't use GAF scores anymore." R. 89-90. Dr. Rozenfeld stated that several bipolar episodes may have been related to alcohol dependence, although she did not draw any firm conclusions and the ALJ did not mention this issue in the later decision. R. 90-91. Dr. Rozenfeld noted that plaintiff was discharged after one incident because, according to records, she was "noted to be using coping skills" and was "not on medication." R. 93.     Plaintiff's

3

work history has been sporadic. As summarized by plaintiff in one report, she worked the "as an inspector for a manufacturing company from 2006 to 2007, as a housekeeper from 1998 to 2000 and again from 2004 to 2006, as an assembler in 1998, and as a loader for a shipping company from 1996 to 1997." R. 337.

On September 24, 2015, the ALJ found that plaintiff had the residual functional capacity ("RFC") to do light work, which included the ability to "sit 6 to 8 hours of the day, and stand and walk at least 6 hours out of the day." R. 15. The ALJ limited plaintiff to "jobs that are simple, repetitive, and routine, with one to three step tasks only, where she would have only incidental contact with the general public and should work primarily alone, having only occasional contact with coworkers and supervisors in a work setting with routine changes only, no multiple changes." *Id.* In the narrative portion of the decision, the ALJ noted that two emergency room doctors indirectly suggested that they believed plaintiff was malingering about her orthopedic problems, but the ALJ never formally made a finding of malingering. R. 17.

As for the medical opinion evidence, the ALJ gave Dr. Schoenwald's opinion "significant weight" and gave the opinions of two State agency physicians "great weight" because their findings were allegedly consistent with Dr. Schoenwald's opinion. For reasons discussed below, the ALJ gave "very little weight" to Ms. McMurray's vocational assessment. The ALJ gave "great weight" to Dr. Rozenfeld's opinions because they were in her field of expertise and consistent with plaintiff's treatment history and mental examinations. The ALJ only gave "some weight" to Dr. Peggau's opinion, concluding that plaintiff's social functioning and concentration limitations were moderate rather than mild as Dr. Peggau had concluded. As for Dr. NieKamp, the ALJ merely noted that he did not any proposed mental RFC; therefore, the ALJ presumably gave this opinion no weight.

The ALJ concluded that plaintiff's mental health problems had been "effectively managed with conservative treatment," noting that she had "never been admitted to inpatient mental health treatment" and was instead "treated with outpatient medication management and occasional counseling services on an as needed basis." R. 18. The ALJ observed that plaintiff mental status examinations were generally normal. Although plaintiff had a "few exacerbations" from her bipolar disorder, the ALJ found that they were "secondary to unusually stressful circumstances and/or medication noncompliance."[4] *Id.*

In the credibility analysis, the ALJ gave four reasons for finding plaintiff not credible. First, the objective medical evidence did not support plaintiff's allegations. The ALJ did not cite to any specific examples, at least in this part of the decision. Second, plaintiff received only routine and conservative treatment, which was not the "type of medical treatment one would expect for a disabled individual." *Id.* For example, plaintiff had "not been admitted for inpatient psychiatric care" or been referred to a specialist such as a neurologist or orthopedist. *Id.* The ALJ also noted that there were "gaps" in plaintiff's treatment history, although the ALJ did not specify how many or how long they were. Third, plaintiff "frequently neglected to take her prescribed psychotropic medications," which demonstrated a "possible unwillingness to do what is necessary to improve her conditions," which in turn was "an indication that her symptoms are not as severe as she [reports]." *Id.* Fourth, plaintiff took several "extended" out-of-state trips in 2015. One was in January 2015 when she traveled to Mississippi to help a daughter care for her children after a hip surgery. The other was in June 0215 when plaintiff traveled to South Dakota by bus to visit another daughter for two and a half weeks. The ALJ acknowledged that "travel

---

[4] The ALJ identified four exacerbations (December 2012, October 2014, December 2014, and July 2015), and concluded that they were all triggered by external events such as losing a friend to cancer and being proscribed by DCFS from visiting her grandchildren. According to the ALJ, in each these instances, plaintiff was "quickly stabilized with a reintroduction of and sometimes a slight adjustment to, her medication regimen." R. 18.

5

and a disability are not mutually exclusive," but found that plaintiff's ability to help care for her daughter and grandchildren "tends to suggest" that her problems "may have been overstated." *Id.*

## DISCUSSION

Plaintiff raises the following five arguments for remand: (i) the ALJ wrongly rejected Ms. McMurray's assessment (ii) the ALJ failed to address a contrary finding from Dr. Schoenwald's opinion; (iii) the ALJ failed to accommodate plaintiff's concentration problems; (iv) the ALJ made unsupported assumptions about expected treatment and compliance; and (v) the ALJ gave too much weight to the out of town trips. After reviewing the briefs, the Court finds the second and fourth arguments are the strongest, and collectively warrant a remand.

**I.   Dr. Schoenwald's Opinion.**

On November 20, 2013, Dr. John Schoenwald provided the following opinion:

> Overall impression is this lady could do sedentary light dexterous type of work and could perhaps learn a new job occupation. She could certainly sit with short breaks for six to eight hours a day, but would not recommend prolong[ed] standing over two hours or walking over two hours or excessive bending or stooping or reaching. It is really uncertain exactly what she could do because she has not worked for 10 years. Her mood seems stable, but job stress would have to be more of a low stress job because of her history of bipolar disorder.

R. 2427. The ALJ gave this opinion "significant weight" based on the following explanation:

> As for the medical opinion evidence, the claimant's family physician, John J. Schoenwald, MD, noted in a treatment record from November 2013, that she could perform sedentary-light work. Specifically, he opined that she could sit with short breaks for 6 to 8 hours a day, but should not stand or walk for over 2 hours or engage in excessive bending, stooping, or reaching. He further opined that she would require a "low stress" type job given her history of bipolar disorder. As support for his opinion, he noted that her primary issue is her limited range of motion of the neck and limited lifting capacity. He further indicated that she has good dexterity and fine motor functioning, good grip strength, and has no major weakness in the upper or lower extremities (Exhibit 34F/ 15-16). The undersigned accords Dr. Schoenwald's opinion significant weight as he had a treating relationship with the claimant and his opinion is consistent with his objective findings, which are reflected in his treatment records (Exhibit 34F).

R. 17-18.

As a preliminary observation, the Court notes that the ALJ's heavy reliance on the opinion from a plaintiff's own treating physician to support a finding that the plaintiff was *not* disabled differs from the usual case where such opinions more clearly and uniformly support the plaintiff's case and are distinguished and criticized by the ALJs on various grounds. Here, putting that point aside, plaintiff argues that there was at least one key finding from the opinion that is still at odds with the ALJ's finding that plaintiff could do light work. This is the finding that plaintiff could stand or walk for only two hours whereas the ALJ found that she could do so for six hours. Plaintiff's argument is straightforward: the ALJ failed to address this obvious discrepancy.

After reading the two paragraphs above, the Court agrees. Although the ALJ referred to Dr. Schoenwald's two-hour limitation, the ALJ never explicitly addressed the contradiction. It is not clear why. Perhaps the ALJ simply overlooked it. But the contradiction is significant enough to require *some* explanation.

The Government argues that the ALJ, in fact, did provide an answer. The Government points to the ALJ's summary of the doctor's opinion. The ALJ noted, for example, that Dr. Schoenwald identified plaintiff's "primary issue" as neck range of motion and lifting abilities, and that he found that plaintiff had no major weakness in her extremities. From these statements, the Government infers that the ALJ must have reasoned that the doctor's two-hour limitation was contradicted by the doctor's own underlying findings. In short, the Government is essentially reading between the lines to extract an implied rationale from the ALJ's statements.

The Court is not convinced. The Government does not explain why the ALJ did not simply address the contradiction explicitly and provide an explanation? Also, if it were truly the

7

case that the ALJ rejected parts of the opinion, then why did the ALJ give the opinion "significant weight" rather than, for example, giving it only "some weight" just as the ALJ did with Dr. Peggau's report? And why did the ALJ later state that Dr. Schoenwald's opinion was consistent with the State agency physicians who found that plaintiff could walk and stand for six hours? All these anomalies undermine the Government's theory that the ALJ was aware of the contradiction and resolved it implicitly. On remand, the issue should be addressed explicitly.

## II. Treatment and Compliance.

Plaintiff argues that the ALJ made two improper assumptions about her treatment. The first is that the lack of "inpatient" treatment indicated that plaintiff's mental problems were not serious. The ALJ clearly gave significant weight to this rationale, mentioning three separate times throughout the decision. *See* R. 14-15, 18, 22. Although the ALJ never precisely defined the phrase inpatient treatment, the Court assumes it refers to an extended stay in a hospital or living in an overnight treatment facility. The Seventh Circuit and district courts in this circuit have criticized this type of argument in Social Security disability cases. *See, e.g.*, *Mattson v. Berryhill*, 2017 WL 5011890, *5 (N.D. Ill. Nov. 2, 2017) ("It is plausible that one may be unable to work but not need psychiatric hospitalization, and someone may experience panic attacks without having objective evidence of them."); *Adams v. Berryhill*, 2017 WL 4349718, *12 (N.D. Ind. Oct. 2, 2017) ("While inpatient hospitalization can be indicative of serious mental health symptoms, a lack of hospitalization does not necessarily mean that the individual's symptoms are not disabling."). In *Quinones v. Colvin*, 2017 WL 337993 (N.D. Ill. Jan. 23, 2017), the Court explained:

> the ALJ appeared to have decided that Claimant was not credible because "[i]n spite of allegations of severe panic attacks, she had never been hospitalized." (R. 16.) This reasoning, however, has been rejected by the Seventh Circuit, which has noted that "[t]he institutionalization of the mentally ill is generally reserved for

8

> persons who are suicidal, otherwise violent, demented, or (for whatever reason) incapable of taking even elementary care of themselves." *Voigt v. Colvin*, 781 F.3d 871, 876 (7th Cir. 2015). Nothing in the SSRs or regulations requires a claimant to be hospitalized to demonstrate a severe mental impairment. *Worzalla v. Barnhart*, 311 F.Supp.2d 782, 796 (E.D. Wis. 2004). The ALJ offers no support for his apparent assumption that Claimant had to be hospitalized before her testimony would be deemed credible.

*Id.* at *4. In its brief, the Government does not address this argument in any substantive way, and does not cite to any contrary case law or other authority.

Additionally, the ALJ's conclusion that inpatient care was the type of treatment that "one would expect" was not supported by any medical opinion. In her testimony, Dr. Rozenfeld did not rely on the lack of inpatient treatment, nor did any other doctor insofar as this Court can determine. For this reason, the ALJ's rationale constitutes a layperson judgment about what treatment is appropriate or normal for plaintiff's particular combination of impairments. On remand, more attention should be given to this question, and an expert opinion should be sought about what treatments are routine or conservative.[5]

The second questionable assumption is that plaintiff's failure to consistently take medications indicated that her problem was not serious. Relying on a well-established line of Seventh Circuit cases, plaintiff argues that the ALJ failed to consider the possibility that the non-compliance was caused by the bipolar illness. The Seventh Circuit has explained as follows:

> [I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease), may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.

---

[5] The Court recognizes that there is a parallel argument that plaintiff's *outpatient* care was also occasional and sporadic. This argument is potentially stronger, but the ALJ's decision does not develop the factual predicate because it is unclear how occasional plaintiff's treatment actually was. Plaintiff argues that she received extensive counseling at Rosecrance.

9

454 F.3d at 630 (citations omitted); *see also Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.").

In her opening brief, plaintiff cited to *Kangail*, *Jelinek*, and other Seventh Circuit cases, which plaintiff in her reply brief refers to as a "bevy of legal precedent." Dkt. #17 at 9. The Government, in its response brief, does not even acknowledge, much less distinguish, any of these cases. Instead, the Government simply doubles down on the ALJ's rationale with the following argument:

> Plaintiff also alleges that the ALJ erred in considering her non-compliance in evaluating her symptoms because bipolar disorder is known for causing treatment non-compliance. *See* Brief at pp. 19-20. *While that may be true*, this completely overlooks plaintiff's acknowledgment that she knew that [she] should not stop taking her bipolar medication just because she felt better. Indeed, in March 2014, she told her Rosecrance counselor that she knew that her mindset was "silly" that she did not need to take her medication any longer when she felt better (Tr. 2390). She also said at the August 2015 hearing that she did not know the reasoning behind her decisions to stop taking her medication because she knew that three or four days later she would need to be back on them (Tr. 73). As noted by the ALJ, this demonstrated an unwillingness to do what was necessary to improve her mental impairments (Tr. 22). This discounted her complaints.

Dkt. #16 at 11-12 (emphasis added). This argument superficially acknowledges the possibility that bipolar disorder can cause medication non-compliance, but then just assumes, without explanation, that it was not the case for plaintiff. This is question-begging. In sum, if this Court were to reject plaintiff's argument, the Court would have to distinguish these Seventh Circuit cases and construct a counter-argument from scratch. This is not this Court's role.

### III.  Remaining Arguments.

Having found that a remand is warranted, the Court will briefly comment on the remaining arguments.

10

### A. McMurray Vocational Assessment.

Plaintiff complains that the ALJ gave little weight to Ms. McMurray's assessment—principally, her conclusion that plaintiff's motor score was low.[6] The ALJ rejected the assessment because Ms. McMurray was not a physician qualified to assess plaintiff's physical or mental abilities and because it was based "solely" on plaintiff's subjective reports. Plaintiff criticizes both rationales.

The Government defends the rationales. It asserts that "there is no evidence that Ms. McMurray was an expert in assessing vocational capacity" or had "any training, qualification, or expertise in administering vocational assessments." Dkt. #16 at 5. In her reply brief, plaintiff does not respond to this assertion other than making the vague argument that the vocational expert was aware of one of the tests administered by Ms. McMurray. Although it would be surprising if Ms. McMurray truly had no training, the ALJ and the Government raise a valid question about the degree of her expertise, and whether her opinion should be credited over that of Dr. Schoenwald who found that plaintiff had "good dexterity and fine motor" skills—a conclusion directly contrary to Ms. McMurray's low motor score assessment. R. 2426. As for the ALJ's claim that Ms. McMurray relied "solely" on plaintiff's subjective reports, this rationale is overbroad. Ms. McMurray administered motor tests in which she personally observed plaintiff doing tasks such as putting beads in a box. On the other hand, the Government notes that Ms. McMurray's found that plaintiff could only do sedentary part-time work even though Ms. McMurray "did not test plaintiff's ability to lift, sit, stand, or walk." Dkt. #16 at 6. On remand, the ALJ should consider these issues more carefully and resolve the contradictions, particularly the sharp divergence between Ms. McMurray and Dr. Schoenwald regarding dexterity.

---

[6] The motor score was an assessment of plaintiff's fine and gross motor skills. Ms. McMurray administered various manipulation tests, such as having plaintiff place beads in a box for thirty seconds. R. 338.

11

**B. Concentration Problems.**

Plaintiff argues that the ALJ found, as part of the listing analysis, that she had moderate difficulties in concentration, persistence or pace but then included only a limitation to simple and routine work involving limited interactions with people. (The full precise wording is quoted above.) This argument relies on the *O'Connor-Spinner* line of cases and is one made often in this Court.[7] The Government argues that the RFC in this case contained more nuanced and detailed limitation than merely routine and simple jobs and argues that the added restrictions make this case different form the *O'Connor-Spinner* cases. But here again, the Government has not discussed the cases, and therefore has not provided a clear explanation for its implicit claim that the longer RFC here falls under an exception to the *O'Connor-Spinner* cases. On remand, the ALJ should provide greater clarity on the question of plaintiff's alleged concentration and persistence problems, by both making it clear upfront what those specific problems were (it is not clear to the Court) and then explaining exactly how they would be accommodated by the RFC.

**C. Out-of-State Trips.**

Plaintiff argues that the ALJ placed too much weight on these trips, arguing that the ability to "sit on a bus for an extended period of time does not correlate to being able to be on her feet for six out of eight hours daily." Dkt. #15 at 20. The Court agrees that it will rarely be possible to draw a straight line from a single discrete activity—such as taking a trip or gardening—to the bottom-line conclusion that a claimant was not disabled. But this does not mean that these activities, when considered as part of a larger mosaic of evidence, have no

---

[7] In a recent case, this Court discussed some of the complexities and problems in assessing these seemingly straightforward arguments. *See Permenter v. Berryhill*, 2018 WL 2045452, *7 (N.D. Ill. May 2, 2018) ("One recurring frustration in analyzing *O'Connor-Spinner* arguments is that they tend to bypass the complex medical record and myopically focus on the precise meaning of short linguistic formulations. Lost in this process is the larger explanation—the logical bridge—about how all the mental health evidence fits together.").

relevance. It is a matter of proportionality. It depends on how strong and how many other credibility rationales there are. On remand, the ALJ should be cautious about placing too much weight on these trips or, alternatively, should be more precise in identifying which of plaintiff's allegations are seen as less credible in light of them. For example, if plaintiff were claiming that her anxiety made it difficult to leave her home or be around strangers, then these trips would be relevant to that particular allegation.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: July 6, 2018 By: _____
Iain D. Johnston
United States Magistrate Judge